## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| RMS OF GEORGIA, LLC D/B/A CHOICE REFRIGERANTS, <br><br> *Plaintiff*, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> *Defendants*. | CIVIL CASE NO. 23- |

## **COMPLAINT**

Plaintiff RMS of Georgia, LLC d/b/a Choice Refrigerants ("Choice") files this Complaint seeking a declaratory judgment and injunction because the American Innovation and Manufacturing Act of 2020 ("AIM Act"), a statute with a direct impact on Choice's business, indeed its very viability, violates fundamental protections that exist in the United States Constitution. Specifically, Congress transgressed constitutional limitations when it transferred legislative power to the United States Environmental Protection Agency ("EPA").

1

## INTRODUCTION

1.      The Constitution, by design, vests separate and largely exclusive powers in each branch of the United States government. Congress, therefore, cannot hand its constitutionally vested legislative power over to the Executive.

2.      Despite this fundamental protection against concentration of coercive government power, Congress transferred legislative authority to EPA, an executive agency, in the AIM Act.

3.      The AIM Act phases down production and consumption of hydrofluorocarbons ("HFCs"), non-toxic compounds commonly used as refrigerants in air conditioners, refrigerators, and freezers. HFCs previously replaced ozone-depleting chlorofluorocarbons and other dangerous refrigerants such as ammonia.

4.      The AIM Act directs EPA to erect a cap-and-trade system using "allowances" to accomplish the HFC phase down. In doing so, Congress went into great technical detail to instruct EPA how to calculate production and consumption baselines to measure against, the "value" for each regulated substance, and the percentage of HFC reduction to be achieved in multiple steps over a sixteen-year time span.

5.      The statute, however, contains a gaping hole. Congress did not provide any instruction or even policy suggestions to EPA regarding who would receive the "allowances" newly required for HFC production and consumption, nor in what

amounts or proportions. Congress provided no intelligible principle to constrain EPA's discretion in doling out or withholding allowances, nor sufficient instruction to permit a court to evaluate whether EPA effected or violated Congress's will.

6.    Congress's dereliction of duty ultimately enabled EPA to grant some allocations attributable to Choice's products to a foreign-owned intellectual property pirate who illegally imported a knock-off version of Choice's proprietary HFC product, and to Choice's former business partner, rather than to Choice Refrigerants itself. EPA provided no insight into its black box decisions that resulted in shortchanging Choice by some 30% compared to the number of allowances that it anticipated based on its historical market share.

7.    The AIM Act unlawfully gives EPA unfettered discretion as to whether Choice maintains the market share that it innovated, labored, and invested to achieve, or whether Choice even remains in business at all. This arrangement vests legislative power in the Executive Branch. But our constitutional system requires decisions about how companies thrive or shutter under a cap-and-trade regime to be made by duly elected representatives, not unaccountable bureaucrats.

## PARTIES

8.    Plaintiff RMS of Georgia, LLC d/b/a Choice Refrigerants is a small manufacturing business with its principal place of business in Alpharetta, Georgia. For more than 15 years, Choice has imported, produced, and sold refrigerants.

Choice patented a proprietary HFC blend, R-421A, which was approved for use in the refrigerant market in 2006 and is popular as an environmentally preferable substitute for older ozone-damaging refrigerants. Choice's proprietary blend and other products are subject to the AIM Act.

9.    Defendant Michael S. Regan is the Administrator of the United States Environmental Protection Agency headquartered in Washington, DC. Administrator Regan is sued in his official capacity.

10.    Defendant United States Environmental Protection Agency is a federal agency charged by Congress with implementing the AIM Act and other federal laws. EPA is headquartered at 1200 Pennsylvania Ave., NW, Washington, DC 20460.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Choice's claims arise under federal law, particularly the United States Constitution. Specifically, Choice asserts that the AIM Act unlawfully delegated legislative power to EPA in violation of Article I's Vesting Clause.

12.    This Court has jurisdiction to grant the declaratory relief sought pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

13.    Solely in the alternative, this Court has jurisdiction pursuant to 5 U.S.C. §§ 701, *et seq.*, because Choice seeks to enjoin EPA from continuing to act under an unconstitutional statute.

4

14.     Venue is proper within this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officials sued in their official capacities, Choice's principal place of business is in this district (in Alpharetta, Georgia), and real property is not at issue.

## BACKGROUND

### I.     LEGAL BACKGROUND

#### A.     Constitutional Mandates

15.     "'If there is a principle in our Constitution, indeed in any free Constitution more sacred than another, it is that which separates the legislative, executive and judicial powers.'" *Myers v. United States*, 272 U.S. 52, 116 (1926) (quoting 1 ANNALS OF CONG. 581 (1791)).

16.     By declaring that its powers "shall be vested," the Constitution not only vests legislative, executive, and judicial power in discrete branches, but dictates where such powers "shall," and thus must, be located. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (confirming that the Constitution's "text permits no delegation of [legislative] powers"); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]t is a breach of the national fundamental law if Congress gives up its legislative power and transfers it to the President[.]").

17.     The Framers understood consent of the governed to be the underpinning of legitimate governmental authority. *See* THE DECLARATION OF INDEPENDENCE

para. 2 (U.S. 1776) ("That to secure these rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed*[.]") (emphasis added).

18.    "So they placed the legislative power into the hands of the branch that was most accountable to the people. And if any problems arose, 'the people could respond, and respond swiftly' to remedy any 'misuse[]' of power." *Allstates Refractory Contractors, LLC v. Su*, No. 22-3772, 2023 WL 5420372, at *9 (6th Cir. Aug. 23, 2023) (Nalbandian, J., dissenting) (quoting *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 674 (6th Cir. 2021) (Thapar, J., concurring)).

19.    "If Congress could pass off its legislative power to the executive branch, the '[v]esting [c]lauses, and indeed the entire structure of the Constitution,' would 'make no sense.'" *Gundy v. United States*, 139 S. Ct. 2116, 2134–35 (2019) (Gorsuch, J., dissenting) (alteration in original) (quoting Gary Lawson, *Delegation and Original Meaning*, 88 VA. L. REV. 327, 340 (2002)).

20.    In other words, Congress is tasked with legislating because the People have consented to allow this carefully structured, elected, bicameral legislative body most representative of the People to enact our laws. Abdicating legislative power eviscerates this consent and disregards the Constitution.

21.    Yet Congress unlawfully transferred its legislative power to EPA when it passed the AIM Act.

**B.**     **The AIM Act**

22.     On December 27, 2020, Congress passed the AIM Act as part of an omnibus budget measure. The AIM Act directs use of a cap-and-trade regime to phase out production and consumption of HFCs. *See* 42 U.S.C. § 7675. Congress handed the task of implementing the program to the EPA. 42 U.S.C. §§ 7675(c), (e).

23.     At its core, the AIM Act requires that all future production or consumption (*i.e.*, import) of HFCs requires government-issued "allowances." *See generally* 42 U.S.C. § 7675.

24.     Allowances are defined as "a limited authorization for the production or consumption of a regulated substance[.]" 42 U.S.C. § 7675(b)(2).

25.     The number of available allowances decreases over time, and by 2036, the dwindling allowances will eliminate 85% of the HFC industry in the United States. *See* 42 U.S.C. § 7675(e); 40 C.F.R. pt. 84 (2021) (EPA implementing regulations).

26.     The AIM Act designated the EPA Administrator to carry out its mandates. *See* 42 U.S.C. §§ 7675(c), (e). In doing so, Congress specified the compounds subject to the Act and prescribed a detailed, technical method for establishing a baseline (*i.e.*, the cap in cap-and-trade) from which to measure the phase-down. *Id.*

27.     In contrast, Congress provided EPA with absolutely *no* guidance as to *who* should receive the "allowances" now needed to continue to produce or consume regulated HFCs. *See* 42 U.S.C. § 7675(e)(3).

28.     Rather, Congress commands a phasing down of HFCs through an undefined "allowance allocation and trading program in accordance with" the Act and the schedule set by Congress with no direction for how to determine the core question of who receives allowances. 42 U.S.C. § 7675(e)(3).

29.     The AIM Act does specify that some allowances must be allocated on a priority basis to producers and consumers of six essential uses of HFCs. These six uses account for only approximately 2% of regulated HFC consumption. *See* 42 U.S.C. § 7675(e)(4)(B)(iv); *Phasedown of Hydrofluorocarbons: Notice of 2023 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020*, 87 Fed. Reg. 61,314, 61,316–17 (Oct. 11, 2022) ("2023 Notice") (application specific allowances account for 5,426,319.9 consumption allowances out of 273,496,315 total consumption allowances).

30.     For roughly 98% of the market, the AIM Act provides no criteria or guidance at all as to who should receive the allowances required to do business.

31.     The AIM Act, for example, does not provide for market share to be maintained but proportionately reduced in volume, as Congress had previously

directed when phasing out ozone-depleting substances under the Clean Air Act. *See* 42 U.S.C. § 7671c(a).

32.    The AIM Act does not direct EPA to decide what companies should receive allowances based on typical legislative factors such as principles of fairness, expectations of market participants, effect on the HFC market, or sufficient supply to consumers.

33.    The AIM Act does not reflect any legislative consideration of factors such as time in business, percentage of business, geographic priorities, or any other objective standards by which allowances could be distributed.

34.    Nor does the AIM Act provide any priorities, incentives, or disincentives based on safety records, compliance records, or other lawful or unlawful conduct.

35.    Indeed, apart from its title, which refers to *American* innovation and manufacturing, the AIM Act does not express any policy concerning the allocation of allowances.[1] The Act is bereft of any legislative findings, any discussion of policy, or any indication of a guiding star for implementation other than that HFC use should be reduced.

36.    Absent such principles, Choice's ability to continue the business it has built over a decade and a half, a business it anchored around an environmentally

---

[1] In practice, EPA granted allowances to foreign pirates, defying the Act's very title.

preferable product that it innovated and patented, is now subject to the whim of unknown EPA bureaucrats who are not accountable (or responsive) to Choice or even to Choice's elected officials.

37.    The allocation of allowances under this cap-and-trade regime is quite literally life-or-death for small businesses that receive, or do not receive, allowances to continue their business under EPA's centralized planning. The unfettered delegation in the AIM Act empowers EPA to dismantle the HFC industry and hand out the remnants to whomever it chooses.

## II.    THE AIM ACT LACKS A REQUIRED INTELLIGIBLE PRINCIPLE, HANDING EPA THE POWER TO LEGISLATE

38.    While Congress may delegate implementation of legislation to an executive agency, it may not delegate the prerogative of legislating.

39.    "Congress may delegate authority to a coordinate branch when it lays 'down by legislative act *an intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform[.]" *United States v. Brown*, 364 F.3d 1266, 1270–71 (11th Cir. 2004) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). Without such a principle, courts are unable "to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 425 (1944).

40.    "The Supreme Court summarized the 'intelligible principle' test in these terms: a delegation of legislative power will be 'constitutionally sufficient if

Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority.'" *Brown*, 364 F.3d at 1270–71 (quoting *Mistretta*, 488 U.S. at 372–73).

41.     Congress satisfied only prong two of that test by giving authority to EPA. The AIM Act contains no general policy that guides which existing market participants would receive allocations. Indeed, EPA did not even limit the list of potential recipients to existing market actors. As discussed below, the boundaries of EPA's legislative authority to establish policy in identifying allowance recipients are practically unbounded.

**A.      Absent an Intelligible Principle from Congress, EPA Developed and Implemented its Own Policy Priorities.**

42.     In its May 2021 notice of proposed rulemaking pursuant to the AIM Act, EPA recognized that its power to choose allowance recipients was practically uncircumscribed. *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150, 27,166, 27,178 (proposed May 19, 2021) (to be codified 40 C.F.R. pts. 9, 84) ("2021 Proposed Rule") (noting EPA's "considerable" or "significant" discretion in assigning allowances).

43.     Lacking any sort of guidance from Congress, EPA appears to have written its own set of "intelligible principles" to develop allocation plans. Specifically, EPA states:

> [C]onsiderations for determining who should receive allowances in this initial rulemaking would include providing as seamless a transition as possible to a regime where allowances are needed to produce and import HFCs, promoting equity, timeliness of implementation, and availability of robust data.

2021 Proposed Rule at 27,169. Tellingly, none of these principles is found in the AIM Act itself nor is any of them tied to an identified legislative purpose or policy.[2]

44.    An agency cannot cure an improper delegation of power by supplying the "intelligible principles" it will use to administer a statute. *See Whitman*, 531 U.S. at 472–73; *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) (discussing "regulations clarifying an ambiguous statute" and determining that "[t]he needed clarity cannot be so provided—it must come directly from the statute").

45.    EPA acknowledged that Congress was presumed to know the law and would have been familiar with how EPA went about phasing out ozone-depleting substances under the Montreal Protocol and Clean Air Act, but EPA felt it was free to modify its approach here. *See* 2021 Proposed Rule at 27,154 (noting "Congress is generally presumed to legislate with an awareness of the existing law that is pertinent to enacted legislation," and the "similarities [of] the text, structure, and function" in

---

[2] Because EPA gave only a non-exclusive list of some factors it "would include," it is unknown whether EPA also applied or how it may have weighed other considerations.

the AIM Act and the EPA "program phasing out ozone-depleting substances," but concluding that EPA was permitted to "build on its experience" to make changes).

46.     EPA recognized that under "CAA Title VI, EPA allocated baseline allowances and annual year allowances derived from those *company-specific baselines*." 2021 Proposed Rule at 27,168 (emphasis added). Here, however, EPA proposed and ultimately implemented "a different approach for allowances," to allow for greater agency "flexibility," *id*., in other words, to maximize EPA's power across time.

47.     Instead of allocating baselines to existing market participants by company, EPA proposed five different allocation schemes for determining allowance recipients, suggesting that the schemes may change over time. *See* 2021 Proposed Rule at 27,203. Although EPA presumably determined that all the schemes were consistent with the statute, none of the schemes proposed by EPA, nor the concept that allocation schemes could change, may be found in the AIM Act.

48.     First, EPA proposed to allocate "allowances based on past production and consumption from a set period of years and only adjusting allowance holders to reflect transfers between companies[.]" *Id*.

49.     Second, EPA proposed to allocate "allowances based on a reevaluation of the most recent years of production and consumption data as reported to EPA (*e.g.*, three years)[.]" *Id*.

50.     The third proposal would allocate "allowances based on past production and consumption, but requiring a fee for every allowance provided for production or import of HFCs[.]" *Id*.

51.     Fourth, EPA suggested it might "[e]stablish[] an auction system for the total set, or some subset, of generally available allowances[.]"[3] *Id*.

52.     Finally, EPA sought input as to "[a] combination of the above approaches, such as phasing in the use of an auction or fee over time." *Id*.

53.     Ultimately, in 2022–2023, the initial years of the program, EPA based general pool allocations on companies' three highest years of production or consumption between 2011 and 2019, but only for companies still in business in 2020. *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116, 55,118 (Oct. 5, 2021) ("2021 Final Rule") (codified at 40 C.F.R. pts. 9, 84).

54.     EPA reserved, however, the right to "revisit how to allocate allowances for 2024 and beyond." 2021 Proposed Rule at 27,157.

---

[3] Generally available allowances or the "general pool," are those not set aside for application-specific uses or those not set aside by EPA for new market entrants, as discussed below.

55.     Additionally, paying homage to the "promoting equity" principle that EPA made up out of whole cloth, EPA decided that it would take business opportunities from existing market participants, in order to set aside and then distribute allowances to those "that may have had particular challenges entering the HFC import market due to systemic racism, market-access barriers, or other challenges particularly faced by small disadvantaged businesses such as minority- and woman-owned small businesses." 2021 Proposed Rule at 27,177. Like EPA's other proposals, this Robin Hood policy has no basis in the AIM Act itself.[4]

56.     EPA also acknowledged that the equity set asides deviated from its prior ozone-depleting substances program, 2021 Proposed Rule at 27,176, the one that might have informed Congress's expectations. *Id.* at 27,154.

57.     Ultimately EPA set aside nearly 3% of available allowances for unidentified and new market participants.[5] 2021 Final Rule at 55,118. This EPA-

---

[4] *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 27,150, 27,158 (proposed May 19, 2021) (to be codified 40 C.F.R. pts. 9, 84) ("2021 Proposed Rule") (acknowledging that "determination of whether there [has been] a disproportionate impact that may merit Agency action is ultimately a policy judgment").

[5] Interestingly, EPA eventually found that "[c]ommenters did not provide evidence or detailed information that would indicate that certain businesses have historically and could continue to experience difficulty entering the HFC market as a result of structural barriers or social or economic inequities." *Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 88 Fed. Reg. 46,836, 46,853 (July 20, 2023) (codified at 40 C.F.R. pt. 84) ("2024 Final Rule"). In fact, EPA's "review of public comments received from the proposed

created policy reduced existing invested market participants' ability to receive allowances in line with their existing market share.

58.     Further, presumably to advance EPA's self-developed preference for "availability of robust data," or perhaps, EPA's preference to minimize its efforts, EPA elected to grant allowances based on companies' prior reporting under the Greenhouse Gas Reporting Program, a program that EPA had invented a decade earlier, codified at 40 C.F.R. Pt. 98. 2021 Final Rule at 55,144–45.

59.     The Greenhouse Gas Reporting Program ("GHGRP") had been developed in 2009, well in advance of the AIM Act, and its purpose had nothing to do with allocating market share. By making this unguided policy choice, EPA adopted a system that gave allowances to paperwork filers rather than to the actual producers or patent-holders of proprietary HFCs. The absurd result caused allowances to be granted to a former business partner of Choice, even though the HFCs imported were for Choice-branded products. EPA's policy choices also enabled scofflaws that had illegally imported HFCs (but filed GHGRP paperwork) to receive allowances.

60.     In the absence of any constraining guidance, EPA took further liberties with its power and granted itself the ability to "retire, revoke, or withhold allowances

---

rulemaking associated with this rulemaking did not yield any such records either." *Id.*

as well as potentially ban a company from receiving future allowances as administrative consequences" for various infractions that EPA identified but which do not appear in the statute. 2021 Final Rule at 55,168–69. In so doing, EPA used its power to create the allocation program to change the definition of an "allowance," that Congress supplied. *See* 42 U.S.C. § 7675(b)(2) (statutory definition of "allowance"); 2021 Proposed Rule at 27,161 (EPA proposes to add a qualification to Congress's definition). This power and these infractions are EPA's own creations based on its own policy choices, not implementation of statutory directives.

61.    To be clear, Choice cites these examples from EPA's rulemaking notices only to demonstrate the breadth of unbridled legislative discretion transferred to EPA in the AIM Act and EPA's acknowledgement that its discretion was unconstrained. Choice challenges the AIM Act for its unconstitutional delegation of this legislative power. This case does not challenge the substance of EPA's rulemaking.

**B.      Choice Refrigerants has Been Harmed by Lack of an Intelligible Principle in the AIM Act.**

62.    In its implementing regulations covering the first two years of the cap-and-trade program, EPA had to decide who would get "consumption" allowances to import HFCs under the allowance regime. *See* 2021 Final Rule at 55,116.

63.    EPA decided that allowances would be allocated to the "importer" associated with those historical imports, which it defined in its regulations as any

company that qualified as the importer of record, the actual owner, or the consignee of the shipments. 40 C.F.R. § 84.11 (calculation of import allowances); 40 C.F.R. § 84.3 (definition of "importer").[6]

64.     During the public comment rulemaking process for EPA's 2021 Rule, Choice submitted multiple letters informing the government of a significant number of HFC shipments that Choice believed should be credited to Choice's import history, but which the agency might mistakenly credit to others.

65.     First, Choice explained that it had arranged to import feedstocks for its manufacturing business years earlier through a former business partner ("Company A").[7]

66.     Choice explained to EPA that although Company A had arranged these imports, Choice should be considered the true importer because the imports were to be used in Choice's manufacturing process in Alpharetta and for Choice-branded proprietary products.

---

[6] Eventually EPA interpreted this definition to mean that the entity that filed the GHGRP paperwork was the "importer" entitled to allowances. *See, e.g.*, *Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 88 Fed. Reg. 46,836, 46,848 (July 20, 2023) EPA intends to rely on the entity that has historically reported the imports for a shipment to GHGRP") ("2024 Final Rule").

[7] AIM Act information is generally withheld by EPA as confidential business information and is subject to a protective order. Accordingly, Choice has designated pseudonyms for the other companies that apparently received credit for imports that Choice believed should have been credited to Choice.

67.    Choice also explained in its comment letters its belief that, in 2017, a different company ("Company B") had illegally imported a series of shipments of Choice's patented R-421A as part of Company B's illegal scheme to avoid trade duties and infringe Choice's patent rights.

68.    Choice informed EPA that Company B had been the target of a governmental investigation and had been determined by the Department of Commerce to have violated trade laws by using the pirated R-421A to circumvent 285% antidumping duties.

69.    Choice pointed out that it would be against public policy to reward intellectual property pirates by crediting these imports to Company B.

70.    EPA published the 2021 Final Rule on October 5, 2021, in which it laid out the general rules for allocating allowances for calendar years 2022 and 2023. *See generally* 40 C.F.R. pt. 84.

71.    The 2021 Final Rule did not itself make company-specific determinations regarding allocations for individual companies. Based on the plain language of EPA's regulations as proposed and finalized, Choice believed that it should receive allowances with respect to its shipments of its product or product components arranged by Company A and imports of its patented product imported by Company B.

72.    However, when EPA announced the total allowance allocations for calendar year 2022 on October 7, 2021, Choice saw that it had been shortchanged by some 30% compared to the number of allowances that it had anticipated. *See Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the American Innovation and Manufacturing Act of 2020*, 86 Fed. Reg. 55,841, 55,842 (Oct. 7, 2021) ("2022 Notice").

73.    EPA made a substantially identical allocation of allowances for the 2023 calendar year, which similarly shortchanged Choice. *See* 2023 Notice at 61,316. In short, EPA's interpretation of its authority robbed Choice of market share.

74.    EPA did not explain in either allocation notice how or why it made the decision to allocate a smaller number of allowances to Choice. There was no available written agency memorandum, no letter to Choice, and no explanation anywhere of how EPA "did the math" or what factual determinations EPA made to support its allocation decision with respect to Choice.

75.    As noted, EPA's first framework rule covered only the step down of HFC allowances for 2022 and 2023. For calendar years 2024 and forward, EPA subsequently reconsidered how to make allowance allocations for 2024–2028. The related final rule was published in July 2023. *See* 2024 Final Rule at 46,836.

76.    While EPA did not significantly change its allocation methodology for 2024 from the previous 2022/23 framework, EPA again signaled that it believes it has the power to change its allocation methodology, including switching to a fee-based or auction system, as EPA seemingly amends its own legislative policy priorities. *See Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 87 Fed. Reg. 66,372, 66,379 (Nov. 3, 2022) (to be codified at 40. C.F.R. pt. 84) ("2024 Proposed Rule").[8]

## III.    PRIOR LITIGATION

77.    Since implementation of the AIM Act, Choice has actively been seeking to vindicate the protections afforded to it in the text and structure of the Constitution. After EPA published its initial framework allocating allowances in 2021, Choice filed a petition in the United States Court of Appeals for the District of Columbia Circuit to challenge, among other things, the improper delegation of legislative power to EPA. *See* Final Opening Br. for Pet'r RMS of Georgia, LLC at 21–28, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA* ("*HARDI*"), No. 21-1251 (D.C. Cir. July 22, 2022), Doc. 1956091.

78.    Because Choice filed its 2021 petition pursuant to the judicial review provision in Section 304 of the Clean Air Act, the D.C. Circuit interpreted the

---

[8] Choice has filed a challenge to this new rule in the United States Court of Appeals for the District of Columbia Circuit as required by the Clean Air Act.

petition as a challenge to EPA's rule, not a challenge directly to the AIM Act itself. *HARDI*, 71 F.4th 59, 65 (D.C. Cir. 2023).[9] The D.C. Circuit then held that although Choice had provided comments during EPA's rulemaking, it had not specifically administratively exhausted its challenge to the unconstitutional transfer of legislative power and thus, under exhaustion requirements in the Clean Air Act, the court could not reach the merits of Choice's claim. *Id.*[10]

79.   In this case Choice is not challenging EPA's rule or rulemaking and is not invoking the Clean Air Act, rather Choice brings this case under Article I of the United States Constitution and general federal question jurisdiction to enjoin EPA from continued action taken pursuant to an unconstitutional statute.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE U.S. CONSTITUTION, ART. I

80.   Choice incorporates the preceding paragraphs by reference as if fully set forth herein.

---

[9] The D.C. Circuit noted that a challenge only to the AIM Act, not to EPA rulemaking, would fail to state a claim under the Clean Air Act, 71 F.4th at 65, the statute that mandates filing in a federal circuit court of appeals. *See* 42 U.S.C. § 7607.

[10] The D.C. Circuit observed, but did not decide, that Choice may have been free of the exhaustion requirement had it not invoked the Clean Air Act's jurisdiction. *See HARDI*, 71 F.4th at 65 n.2.

81.    The AIM Act transfers legislative power to EPA in violation of the United States Constitution and is therefore unlawful.

82.    The Act does not supply EPA with the proper guidance, constraints, or any other intelligible principle when selecting allowance recipients and the number of allowances permitted per market actor. *See* 2021 Final Rule at 55,116; 2024 Final Rule at 46,836.

83.    The Constitution dictates that "All legislative powers herein granted shall be vested in a Congress of the United States[.]" U.S. CONST. art. I, § 1.

84.    "[T]he lawmaking function belongs to Congress, … and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

85.    "The Constitution does not merely create the various institutions of the federal government; it vests, or clothes, those institutions with specific, distinct powers. The Constitution reflects a separation of powers[.]" Gary Lawson, *Delegation and Original Meaning*, 88 VA. L. REV. 327, 340–41 (2002).

86.    "That [C]ongress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the [C]onstitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892).

87.     "Congress can delegate power to an agency only if it 'lay[s] down by legislative act an intelligible principle to which [the agency] … is directed to conform.'" *W. Va. by and through Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (alteration in original) (quoting *J.W. Hampton*, 276 U.S. at 409).

88.     "When Congress does not provide an intelligible principle, an agency cannot cure the 'unconstitutionally standardless delegation of power by declining to exercise some of that power.' [*Whitman*, 531 U.S. at 473.] Instead, '[t]he very choice of which portion of the power to exercise—that is to say, the prescription of the standard that Congress had omitted—would itself be an exercise of … forbidden legislative authority.' *Id.*" *Morrisey*, 59 F.4th at 1147–48.

89.     Congress failed to provide instructions on the core design aspect of the AIM Act cap-and-trade program—what companies get allowances and therefore live or die in the marketplace. Instead, EPA legislated policy priorities.

90.     The AIM Act unconstitutionally divested far more power than EPA merely administratively "filling up the details" of legislation. The legislative power Congress granted EPA in the AIM Act contravenes the United States Constitution and cannot stand.

91.     Choice is subject to and has been harmed by EPA's unconstitutional exercise of legislative power in implementing the AIM Act.

24

## **PRAYER FOR RELIEF**

Plaintiff Choice requests the following relief from this Honorable Court:

1.  A declaration that 42 U.S.C. § 7675(e)(3) of the AIM Act violates the United States Constitution because it fails to provide an intelligible principle as to how an executive agency is to identify allowance recipients or to distribute allowances among recipients, resulting in the transfer of legislative power to the Executive Branch;

2.  The issuance of permanent injunctive relief enjoining Defendants from enforcing or implementing regulations based on the unconstitutional subsections of the AIM Act;

3.  An award to Choice of the costs of this action and reasonable attorney fees; and

4.  Such other relief for Choice as is just and appropriate.

October 4, 2023                          Respectfully submitted,

                                         Zhonette M. Brown*
                                         Kaitlyn D. Schiraldi*
                                         NEW CIVIL LIBERTIES ALLIANCE
                                         1225 19th St. NW, Suite 450
                                         Washington, DC 20036
                                         Tel.: (202) 869-5210
                                         Fax: (202) 869-5238
                                         zhonette.brown@ncla.legal
                                         kaitlyn.schiraldi@ncla.legal

25

/s/ *Braden Boucek*

Braden Boucek
GA Bar No. 396831
TN Bar No. 021399
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd, Ste. 104
Roswell, GA 30075
Tel.: (770) 977-2131
Fax: (770) 977-2134
bboucek@southeasternlegal.org

*\*Pro hac vice admission forthcoming*